**WO**                                                                                             BL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| Gilbert C. Gonzalez, | ) | No. CV 05-0316-TUC-EHC |
|---|---|---|
| Plaintiff, | ) ) | |
| vs. | ) ) | **ORDER** |
| | ) ) | |
| Darla Elliot, et al., | ) ) | |
| Defendants. | ) ) | |

Plaintiff is pursuing a 42 U.S.C. § 1983 action against the Arizona Department of Corrections (ADC), Director of the ADC Terry Stewart, Correctional Officials Richard Carmody and Heather Hadden, Registered Nurse Joseph A. Renteria, Nurse Practitioner Patricia Mongiat and various John Does (Doc. #127). Defendants moved for summary judgment (Doc. #139).[1] Defendants' motion will be granted in part and denied in part. Plaintiff will be allowed to proceed on his claims that (1) Stewart, in his individual capacity, violated Plaintiff's equal protection and due process rights by transferring him; (2) Stewart, in his individual capacity, failed to protect Plaintiff by transferring him; and (3) Stewart, Renteria, and Mongiat, in their individual capacity, were deliberately indifferent to his serious medical needs.

**I. Procedural History**

Plaintiff alleged that he was an "Arizona Mexican American," which as a group did

---

[1] The Court dismissed Darla Elliot pursuant to a Motion to Dismiss (Doc. #146).

1  not get along with the "California Mexican Americans" (Doc. #127).  As a result of the

2  conflict, several inmates were moved (id.).  The Arizona Mexican Americans, with the

3  exception of Plaintiff, were transferred to Building One (id.).  Plaintiff was transferred to

4  Building Two, where it was known that he was from Tucson (id.).[2]  Soon thereafter, as

5  Plaintiff was going to the cafeteria, several inmates assaulted him (id.).  Plaintiff maintained

6  that (1) ADC and Stewart violated his equal protection and due process rights by transferring

7  him to Building Two; (2) ADC, Stewart, Carmody, and Hadden were deliberately indifferent

8  to his safety by allowing him to be placed in Building Two and failing to sufficiently protect

9  him from other inmates; and (3) ADC, Stewart, Mongiat, and Renteria were deliberately

10  indifferent to his serious medical needs because they did not properly and timely treat his

11  injuries and refer him to an outside consultation (id.).

12        Defendants moved for summary judgment on the grounds that (1) the decision to

13  move Plaintiff was not based on discriminatory intent but was essential to the operation and

14  safety of the facility; (2) Defendants did not know nor should have known of a threat to

15  Plaintiff's safety and Hadden acted promptly and correctly to protect Plaintiff;

16  (3) Defendants did not disregard a serious medical condition but promptly and appropriately

17  treated Plaintiff; (4) Defendants are entitled to Eleventh Amendment immunity in their

18  official capacity; and (5) Defendants are entitled to qualified immunity (Doc. #139).

19        Plaintiff responded that Defendants were aware of the danger to Plaintiff and placed

20  him in a situation where there was inadequate supervision of guards, staff and training (Doc.

21  #143).  Plaintiff argued that the guards did not act fast enough to prevent Plaintiff from being

22  injured and that the medical staff failed to properly fill out the request forms resulting in a

23  delay in treatment (id.).

24

25

26        [2] In their reply, Defendants indicate that Plaintiff was actually placed in a particular
cell block in Building One (Doc. #147 at 2).  Defendants do not contest Plaintiff's statement
27  that he was the only Arizona Mexican American in a particular area.  Thus, in which building
Plaintiff was housed is not relevant and the Court will assume that Plaintiff was moved to
28  Building Two.

1   **II.  Defendant Richard Carmody**

2          "If service of the summons and complaint is not made upon a defendant within 120

3   days after the filing of the complaint, the court, upon motion or on its own initiative after

4   notice to the plaintiff, shall dismiss the action without prejudice as to that defendant."  Fed.

5   R. Civ. P. 4(m).

6          In February 2002, Plaintiff filed a First Amended Complaint (Doc. #5).  The Court

7   ordered service on various Defendants, and informed Plaintiff that the failure to serve any

8   defendant within 120 days of the date of the Amended Complaint or within 60 days of the

9   date of the Court's order could result in the dismissal of the action against the non-served

10  defendant.  Plaintiff filed a counseled Amended Complaint in June 2006, naming as a

11  defendant Richard Carmody (Doc. #127).  Because Plaintiff has not served him, the Court

12  will dismiss Carmody without prejudice.

13  **III.  ADC and John Doe Defendants**

14         The State of Arizona and its arms, such as the ADC, are not "persons" within the

15  meaning of § 1983."  Hale v. State of Ariz., 993 F.2d 1387, 1398 (9th Cir. 1993) (*en banc*);

16  Gilbreath v. Cutter Biological, Inc., 931 F.2d 1320, 1327 (9th Cir. 1991).  Accordingly,

17  Plaintiff's § 1983 claims against ADC will be dismissed with prejudice.

18         Plaintiff named as defendants unknown "John Does."  Rule 10(a) of the Federal Rules

19  of Civil Procedure requires the plaintiff to include the names of the parties in the action.

20  Because Plaintiff has not identified the individuals, they will be dismissed without prejudice

21  from the instant action.

22  **IV.  Summary Judgment Standard**

23         A court must grant summary judgment "if the pleadings, depositions, answers to

24  interrogatories, and admissions on file, together with the affidavits, if any, show that there

25  is no genuine issue as to any material fact and that the moving party is entitled to judgment

26  as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317,

27  322-23 (1986).  Under summary judgment practice, the moving party bears the initial

28  responsibility of presenting the basis for its motion and identifying those portions of the

1 record, together with affidavits, that it believes demonstrate the absence of a genuine issue

2 of material fact. Celotex, 477 U.S. at 323; Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th

3 Cir. 2001) (en banc). In assessing whether a party has met its burden, the court views the

4 evidence in the light most favorable to the non-moving party. Allen v. City of Los Angeles,

5 66 F.3d 1052, 1056 (9th Cir. 1995). All reasonable inferences are drawn in the favor of the

6 nonmovant. Gibson v. County of Washoe, 290 F.3d 1175, 1180 (9th Cir. 2002).

7 If the moving party meets its burden with a properly supported motion, the burden

8 then shifts to the opposing party to present specific facts that show there is a genuine issue

9 for trial. Fed. R. Civ. P. 56(e); Auvil v. CBS "60 Minutes", 67 F.3d 816, 819 (9th Cir. 1995);

10 see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 & n. 4 (1986). If the moving party

11 presents evidence that, taken by itself, would establish the right to a directed verdict at trial,

12 the motion for summary judgment must be granted in the absence of any significant probative

13 evidence tending to support the opposing party's theory of the case. First Nat'l Bank v.

14 Cities Serv. Co., 391 U.S. 253, 290 (1968); THI-Hawaii, Inc. v. First Commerce Fin. Corp.,

15 627 F.2d 991, 993-94 (9th Cir. 1980). Conclusory allegations, unsupported by factual

16 material, are insufficient to defeat a motion for summary judgment. Taylor v. List, 880 F.2d

17 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise

18 provided by Rule 56, designate specific facts that show there is a genuine issue for trial.

19 Anderson, 477 U.S. at 249; Devereaux, 263 F.3d at 1076.

20 **V. Factual History**

21 Due to tension and conflicts between the Arizona and California Mexican Americans,

22 which was demonstrated by multiple altercations, Plaintiff and approximately 20 other

23 inmates were transferred (Doc. #140, ex. C ¶ 8, ex. G at 16; Doc. #144, exs. A, B, C). While

24 the other Arizona Mexican Americans were placed in Building One, Plaintiff was placed in

25 Building Two in an attempt to separate the groups and based on space (Doc. #140, ex. C ¶ 8,

26 ex. G at 16). A correctional officer informed Plaintiff that the move was authorized by

27 Stewart (id. ex. G at 20).

28 On February 22, 2000, soon after Plaintiff was transferred to Building Two, Hadden

1   observed an inmate run up to Plaintiff, jump on Plaintiff's back, and begin hitting Plaintiff

2   (id. ex. D ¶¶ 3-4).  Plaintiff was punched approximately 35 times and kicked several times

3   by inmates who were California Mexican Americans (id. ex. G at 23, 25).  Hadden initiated

4   an Incident Management System (IMS) "A" Team response and assumed command over the

5   situation (id. ex. D ¶ 5, ex. G at 26).  According to ADC operating instructions, the officer

6   who calls an IMS is not to engage or involve herself directly in the incident, but is to observe

7   the situation, call for additional resources, implement tactical priorities and plan for an

8   escalation as needed, and plan for the return to normal operations (id. ex. D ¶ 6).

9   Approximately 15 to 30 seconds after Hadden called the IMS, several other staff members

10   arrived and separated the combatants, restrained the inmates, conducted a "knucks-check,"

11   and obtained identifications (id. ¶¶ 7-9).  Plaintiff was obviously bleeding and thus escorted

12   to medical (id. ¶ 9).  Hadden attested that the fight lasted approximately 3 minutes, and the

13   area was cleaned up and the inmates back in the respective areas 16 minutes after she

14   observed the inmate jump on Plaintiff's back (id. ¶ 12).

15   **VI.  Equal Protection**

16   "To state a claim for violation of the Equal Protection Clause, a plaintiff must show

17   that the defendant acted with an intent or purpose to discriminate against him based on his

18   membership in a protected class." Serrano v. Francis, 345 F.3d 1071, 1082 (9th Cir. 2003).

19   A claim that an inmate's equal protection rights were violated requires proof of

20   discriminatory intent or motive. Navarro v. Block, 72 F.3d 712, 716 (9th Cir. 1995).

21   Plaintiff maintained that in transferring him to Building Two, Stewart engaged in

22   traditional suspect class discrimination with selective enforcement, reverse discrimination,

23   bad faith misconduct, gross abuse of government power, invidious discrimination, selective

24   denial of protective services, and fundamentally unfair procedures (Doc. #127).  The record

25   demonstrates that the tensions between the Arizona and California Mexican Americans were

26   well documented.   And Plaintiff was informed that Stewart authorized his move.

27   Defendants' argument that Plaintiff was placed in Building Two not based on discriminatory

28   intent or motive, but in an attempt to separate the groups, is suspect given that Plaintiff was

1    placed in a building with California Mexican Americans.  Considering the facts in a light

2    most favorable to the non-moving party, Plaintiff, there is a material question  of fact as to

3    why Plaintiff was placed in Building Two.  Plaintiff has set forth sufficient facts to

4    demonstrate that despite knowing of the conflicts between the inmates, Stewart approved a

5    transfer of Plaintiff to a building where he was the only Arizona Mexican American.  And

6    Stewart's intent in approving this transfer is a question which is not properly addressed at the

7    summary judgment stage.  See Harris v. Itzhaki, 183 F.3d 1043, 1051 (9th Cir. 1999)

8    (providing that "[i]ssues of credibility, including questions of intent, should be left to the

9    jury").

10         Plaintiff also has a due process right in being placed in a safe environment.  Due

11   process is a flexible concept that varies with the situation. Zinermon v. Burch, 494 U.S. 113,

12   127 (1990).  To determine the procedural protections to which Plaintiff is entitled, the Court

13   weighs several factors: (1) the private interest that will be affected; (2) the risk of an

14   erroneous deprivation of such interest and the probable value of additional or substitute

15   procedural safeguards; and (3) the government's interest.  Id.  The private interest is

16   Plaintiff's safety, the risk of erroneous deprivation in placing Plaintiff in an unsafe

17   environment is minimal in this situation because Stewart was aware of the conflict between

18   the inmates, and the government has a strong interest in the health and safety of its citizens.

19   There is a material question of fact as to whether Plaintiff was intentionally placed in a

20   building in which he would come into contact with inmates who were inclined to hurt him.

21   Thus, Stewart is not entitled to summary judgment as to Count I.

22   **VII.  Failure to Protect**

23        "[P]rison officials have a duty . . . to protect prisoners from violence at the hands of

24   other prisoners."   Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005) (internal

25   quotations omitted).  "The failure of prison officials to protect inmates from attacks by other

26   inmates may rise to the level of an Eighth Amendment violation when: (1) the deprivation

27   alleged is 'objectively, sufficiently serious' and (2) the prison officials had a 'sufficiently

28   culpable state of mind,' acting with deliberate indifference." Id. "'[D]eliberate indifference

1 entails something more than mere negligence ... [but] is satisfied by something less than acts

2 or omissions for the very purpose of causing harm or with knowledge that harm will result.'"

3 Id.

4       Plaintiff maintained that his constitutional rights were violated based on a failure to

5 protect because (1) he was placed in Building Two; (2) the guards were not properly trained

6 and there was not proper supervision and staffing; and (3) the span of time it took to stop the

7 altercation was unreasonable (Doc. #127).

8       **A.  Placement in Building Two**

9       Plaintiff maintains that he was improperly placed in Building Two by Stewart.

10 Plaintiff makes no allegations regarding the ability of Hadden to transfer him to another

11 facility.  Additionally, Plaintiff did not allege or demonstrate that Hadden was responsible

12 for failing to prevent the actual attack.  Based on the Amended Complaint, Plaintiff has only

13 linked his claim that he was improperly placed in Building Two to Stewart.  See Rizzo v.

14 Goode, 423 U.S. 362, 371-72, 377 (1976) (providing that to state a valid constitutional claim,

15 a plaintiff must allege that he suffered specific injury as a result of the specific conduct of

16 a defendant, and show an affirmative link between the injury and the conduct of the

17 defendant).

18       Stewart is not entitled to summary judgment as to this claim.  The undisputed facts

19 demonstrate that there were multiple altercations between the Arizona Mexican Americans

20 and the California Mexican Americans.  And ADC officials were aware that the fighting

21 between the groups was not ending.  As such, inmates were moved to different facilities and

22 pods in order to maintain safety.  Plaintiff was placed in Building Two due to space concerns.

23 Plaintiff was the only Mexican American from Arizona in a building that housed several

24 California Mexican Americans.  Plaintiff was then attacked by other inmates and was injured.

25 Plaintiff's placement in a building with California Mexican Americans undercuts any claim

26 that Plaintiff was moved in order to maintain safety.  Based on the summary judgment

27 evidence, Plaintiff was placed in a building where he was clearly in danger of an attack, and

28 Stewart was aware or should have been aware of that danger.  See Hearns, 413 F.3d at 1040.

1    Defendants argue that Plaintiff was not attacked by a California Mexican American,

2 citing to Plaintiff's exhibit that indicated that the attacker was born in the Philippines (Doc.

3 #147).  The exhibit to which Defendants refer indicate that the attacker was born in the

4 Phillippines, but claimed to be of Hispanic heritage (Doc. #144, ex. A).  Thus, it is unclear

5 as to the attacker's nationality.  Construing the evidence in a light favorable to Plaintiff, the

6 non-moving party, the Court will assume that the attacker was a California Mexican

7 American.  Based on the evidence currently before the Court, the Court will deny

8 Defendants' Motion for Summary Judgment on Plaintiff's allegation that Stewart was

9 deliberately indifferent to his safety in approving a transfer of Plaintiff to a building which

10 contained rival inmates.

11        **B.  Proper Training, Supervision, and Staffing**

12    Plaintiff argued that the attack was the result of improper training, supervision, and

13 staffing.  Plaintiff maintained that there should have been additional staff in the facility given

14 the conflict and tension.  However, Plaintiff has presented no evidence to demonstrate that

15 additional or different training or supervision would have prevented the attack.  Additionally,

16 as will be discussed below, the correctional officials acted properly and promptly in breaking

17 up the fight.  Accordingly, Defendants are entitled to summary judgment as to this claim.

18        **C.  Failure to Promptly Stop the Assault**

19    Plaintiff argued that Hadden failed to protect him when she failed to promptly and

20 appropriately intervene (Doc. #127).  However, the summary judgment evidence

21 demonstrates that Hadden acted promptly and appropriately.  Hadden observed an inmate

22 attack Plaintiff, and immediately initialed an IMS "A" Team response.  Hadden then

23 maintained her position so that she could observe the situation, call for additional resources,

24 implement tactical priorities and plan for an escalation as needed, and plan for the return to

25 normal operations.  Plaintiff argues that Hadden should have done something else, such as

26 directly intervening.  But the evidence does not support that argument. The IMS procedure

27 is in place to ensure that a response team is called in order to respond to emergencies, while

28 leaving at least one officer in a position to call for additional assistance and observe the other

1  inmates. And, officers immediately intervened in the assault, which lasted mere minutes.

2  The summary judgment evidence proves that the response to the assault was prompt and

3  appropriate. Accordingly, Defendants are entitled to summary judgment as to this issue.

4  Hadden will be dismissed from the instant action.

5  **VIII. Deliberate Indifference to Medical Needs**

6      "[D]eliberate indifference to serious medical needs of prisoners constitutes the

7  'unnecessary and wanton infliction of pain.'" Estelle v. Gamble, 429 U.S. 97, 104-05 (1976).

8  "To demonstrate that a prison official was deliberately indifferent to an inmate's serious . . .

9  health needs, the prisoner must show that 'the official [knew] of and disregard[ed] an

10 excessive risk to inmate health.'" Austin v. Terhune, 367 F.3d 1167, 1172 (9th Cir. 2004)

11 (citing Farmer v. Brennan, 511 U.S. 825, 838 (1994)). "Further, the deliberate indifference

12 must be both 'purposeful,' and 'substantial' in nature.'" Ruvalcaba v. City of Los Angeles,

13 167 F.3d 514, 525 (9th Cir. 1999) (internal citations omitted). "Prison officials are

14 deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay, or

15 intentionally interfere with medical treatment. . . . Mere negligence in diagnosing or treating

16 a medical condition, without more, does not violate a prisoner's Eighth Amendment rights.'"

17 Lopez v. Smith, 203 F.3d 1122, 1132 (9th Cir. 2000) (citations omitted).

18      As a result of the attack, Plaintiff suffered a broken nose, bruised ribs, sore neck,

19 swollen face, a cut on his forehead, and a chipped tooth (Doc. #140, ex. G at 28). Plaintiff

20 was escorted to the infirmary, where Renteria examined him and contacted Mongiat (id. ex.

21 E ¶¶ 2, 5). Renteria testified that as a registered nurse he could not diagnose Plaintiff (id. ¶

22 2). Because the situation was not life-threatening and therefore not an emergency, Renteria

23 cleaned Plaintiff's wounds, gave him ibuprofen, ice, and tissues, and had him return to his

24 cell (id. ¶¶ 6-7, ex. G at 30). Security was notified to observe Plaintiff for any changes in his

25 condition (id. ex. F ¶ 10).

26      The next day, Plaintiff returned to the infirmary and was examined by Nurse

27 Practitioner Mongiat (id. ¶¶ 11-12). The x-rays showed that Plaintiff had a fractured nose

28 (id. ¶¶ 12-13). Plaintiff was given Tylenol 3 and scheduled for a follow-up in six days (id.

1   ¶ 15). Mongiat subsequently submitted paperwork for an outside consultation requesting a

2   re-evaluation by an Ear, Nose and Throat (ENT) specialist (id. ¶ 16). The paperwork was

3   forwarded to the Outside Review Committee, and then to Cental Office (id.). The Outside

4   Review Committee reviews all non-life-threatening speciality requests (Doc. #144, ex. D).

5   Plaintiff was evaluated again by ADC medical staff on February 29 (Doc. #140, ex. F ¶ 18).

6   It was noted that Plaintiff was feeling better and his bumps and bruises were healing (id.).

7   On March 2, Central Office approved the request for a specialist, and Plaintiff was seen by

8   the ENT on March 9 (id. ¶¶ 19-20).

9   At the appointment with the ENT, which occurred 16 days after Plaintiff's nose was

10  broken, Plaintiff's fractured nose was repaired with a "closed reduction" procedure and

11  Plaintiff was prescribed pain medication (id. ¶ 20). Plaintiff testified that the ENT tried to

12  rebreak Plaintiff's nose and when he was unsuccessful, the ENT informed Plaintiff that in

13  order to properly fix Plaintiff's nose it would require a surgical procedure that cost between

14  $12,000 and $15,000 because the nose had fused (id. ex. G at 33).

15  A follow-up appointment was held the next day, and then 11 days later (id. ex. F

16  ¶¶ 21-22). It was noted at the follow-ups that Plaintiff appeared happy and believed that his

17  nose had been properly repaired, and his injuries were healing (id. ¶¶ 21-22). Plaintiff was

18  subsequently transferred to another facility, where on April 11 an intake was conducted and

19  no nose issues were noted (id. ¶ 24).

20  Mongiat attested that ENTs wait for swelling to subside before treating broken noses

21  (id. ¶ 17). Plaintiff testified that it took months for the swelling in his face to go down (id.

22  ex G at 29). The medical record indicates that for several months following the incident,

23  Plaintiff complained about complications from the broken nose (id. ex. F, attach 1).

24  However, in the medical records the medical staff indicated that Plaintiff was not suffering

25  any significant problems (id.). Plaintiff was also seen for requests for pain relief and to have

26  his nose surgically repaired (Doc. #144, ex. F). Plaintiff's requests for repair were denied

27  as cosmetic (id. Ex. G). Since his release from imprisonment, Plaintiff has seen a second

28  specialist for complaints of breathing problems and headaches (id. ex. J). The specialist

1   opined that Plaintiff suffered from "severe right septal deviation [with] extreme bridge

2   deformity" and recommended surgery (id.).

3        Based on the record, there is a disputed issue of material fact as to whether Defendants

4   were deliberately indifferent to Plaintiff's serious medical needs. First, Plaintiff had a serious

5   medical need. Plaintiff's nose was broken and he was in pain. Mongiat believed that the

6   situation was severe enough to require a specialist. Defendants do not argue that Plaintiff's

7   condition was not serious.

8        Second, Plaintiff's medical needs were not immediately addressed. Plaintiff was not

9   seen by an individual who could properly set his nose until 16 days after it was broken,

10  during which time the bone had set improperly. The record is unclear as to which Defendant

11  was responsible for the delay. Defendants maintain that any delay was due to Mongiat's

12  request for a specialist going through the proper channels. However, Defendants' evidence

13  demonstrates that certain medical conditions result in an immediate referral. Defendants do

14  not elaborate on which conditions result in immediate referral, or why Plaintiff's medical

15  condition did not result in immediate referral. Defendants merely argue that Plaintiff's

16  medical condition was neither life-threatening nor an emergency. Thus, the Court cannot

17  determine if Plaintiff's medical condition should have resulted in immediate referral and if

18  the failure to so refer Plaintiff was the result of deliberate indifference on behalf of Renteria

19  and Mongiat. In the alternative, the Court cannot determine if the delay in treating Plaintiff

20  as a result of the failure to immediately refer him was based on ADC procedure requiring

21  medical personnel to fill out a form and send a request for treatment of a broken bone

22  through channels. Accordingly, none of the defendants are entitled to summary judgment on

23  this claim.

24  **IX. Qualified Immunity**

25       If a defendant claims qualified immunity, the court must make two distinct inquires,

26  the "constitutional inquiry" and the "qualified immunity inquiry." See Estate of Ford v.

27  Ramirez-Palmer, 301 F.3d 1043, 1049 (9th Cir. 2002). The "constitutional inquiry" asks

28  whether, when taken in the light most favorable to the non-moving party, the facts alleged

- 11 -

1 show that the official's conduct violated a constitutional right.  <u>Saucier v. Katz</u>, 533 U.S.

2 194, 201 (2001).

3          As discussed above, there is a disputed question of material fact as to whether

4 Plaintiff's constitutional rights were violated by Stewart placing him in Building Two and

5 thereby discriminating against him, violating his due process rights, and failing to protect

6 him; and by Stewart, Renteria and Mongiat due to deliberate indifference to his serious

7 medical needs.  Plaintiff's rights to be protected and against deliberate indifference to his

8 serious medical needs were clearly established at the time of the attack and the subsequent

9 medical intervention.  <u>See</u>  <u>Farmer</u>, 511 U.S. at 833 (providing that "prison officials have a

10 duty . . . to protect prisoners from violence at the hands of other inmates" (internal citations

11 omitted)); <u>Estelle</u>, 429 U.S. at 104-05 (prohibiting prison officials from being deliberately

12 indifferent to inmates' serious medical needs); <u>Navarro v. Block</u>, 72 F.3d 712, 716 (9th Cir.

13 1995) (providing that an inmate's equal protection rights are violated if the official acted with

14 discriminatory intent or motive).  Accordingly, Defendants are not entitled to qualified

15 immunity.

16 **X.  Eleventh Amendment Immunity**

17          Because Plaintiff is not seeking injunctive relief, Defendants are entitled to Eleventh

18 Amendment immunity in their official capacity. <u>See</u> <u>Kentucky v. Graham</u>, 473 U.S. 159, 169

19 (1985) (providing that "the Eleventh Amendment bars a damages action against a State in

20 federal Court"); <u>see</u> <u>also</u> <u>Pennhurst State School and Hospital v. Halderman</u>, 465 U.S. 89,

21 100 (1984) (providing that under the Eleventh Amendment to the Constitution of the United

22 States, a state or state agency may not be sued in federal court without its consent).

23 However, the Eleventh Amendment does not bar an action from proceeding against

24 Defendants in their individual capacities.

25          **IT IS ORDERED:**

26          (1) Defendant Arizona Department of Corrections is **dismissed with prejudice**.

27          (2) Defendants John Does and Richard Carmody are **dismissed without prejudice.**

28

1    (3) Defendants' Motion for Summary Judgment (Doc. #139) is **granted** in part and

2  **denied** in part as follows:

3    (a) the motion is **granted** to the extent that:

4    (1) Plaintiff's claim that his constitutional rights were violated by the failure

5    to train, supervise, and staff the facility is dismissed (Count II).

6    (2) Plaintiff's claim that his constitutional rights were violated by the failure

7    to promptly and appropriately intervene in the attack is dismissed (Count II).

8    (3) Defendant Hadden is dismissed.

9    (4) Plaintiff's claims against Defendants in their official capacities are

10    dismissed.

11    (b) the motion is otherwise **denied.** Plaintiff may proceed as to the following claims:

12    (1) Plaintiff's claim that Stewart violated his equal protection and due process

13    rights by transferring him (Count I).

14    (2) Plaintiff's claim that Stewart failed to protect him by transferring him

15    (Count II).

16    (3) Plaintiff's claim that Stewart, Renteria, and Mongiat were deliberately

17    indifferent to his serious medical needs (Count III).

18    DATED this 21st day of September, 2007.

19

20

21    Earl H. Carroll
    United States District Judge

22

23

24

25

26

27

28